**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

v.                              CRIMINAL ACTION NO. 2:21-cr-00188

LACEY MOORE,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

The Court has reviewed the *Defendant's Motion to Suppress Evidence* (Document 31) in which the Defendant seeks to suppress all evidence and non-*Mirandized* statements derived from his encounter with law enforcement on June 2, 2021.   The Court has also reviewed the *Response of the United States to Defendant's Motion to Suppress* (Document 46) and the attached exhibits (Document 47).   In addition, the Court has considered the evidence and testimony presented during the supervised release revocation hearing held on August 26, 2021.   Because the material facts are not in dispute, the relevant interaction was captured entirely on body camera video, and there was previous sworn testimony regarding the interaction, the Court finds that the facts and legal contentions are adequately presented in the material before the Court and further hearing on the motion would not aid the decisional process.   For the reasons stated herein, the Court finds that the motion should be granted, and the evidence in question should be suppressed.

**FACTUAL BACKGROUND**

On September 30, 2021, Lacey Moore was indicted as a felon in possession of a firearm in violation of 18 U.S.C §§ 922(g)(1) and 924(a)(2).   On December 30, 2021, Mr. Moore filed this

motion, seeking to suppress all evidence discovered by the officers during their interaction, and any non-*Mirandized* custodial statements he made.   Based on a review of the parties' briefings, the body camera video of the incident, the testimony from the Defendant's August 26, 2021 supervised release revocation hearing, and the other exhibits submitted, the Court finds the following:

On June 2, 2021, two uniformed Charleston Police Department Patrolmen approached the Defendant, Lacey Moore, as he was standing in the parking lot of a Par Mar gas station.[1]   The officers, Patrolman McCabe and Patrolman Napier, approached the parking lot after they purportedly witnessed Mr. Moore engaging in possible hand-to-hand interactions and acting suspiciously and evasively when they circled nearby in marked police vehicles.   Officer McCabe moved toward the side of the Par Mar gas station and observed Mr. Moore standing by the front door.

Officer McCabe then extended his arm in the direction of the Defendant, motioning with his fingers for Mr. Moore to come over, and said, "[h]ey buddy, come here for a sec." [2] (McCabe Bodycam Footage at 00:04.)   Mr. Moore then walked toward Officer McCabe on the sidewalk where he and Officer Napier were standing.   Officer McCabe continued, "[l]isten, you ain't in no trouble, I just want to talk to you for a second." (*Id.* at 00:09.)

---

[1] An audio-visual record of the relevant interaction between the officers and Mr. Moore was captured on Patrolman McCabe's body camera and is identified as *Gov't Ex. 1, McCabe Bodycam Footage.* (Document 47-1) [hereinafter "McCabe Bodycam Footage"].

[2] On August 26, 2021, Patrolman McCabe testified regarding some aspects of the encounter during a hearing upon a petition to revoke Defendant's term of supervised release in *U.S. v. Lacy Moore*, 2:19-cr-303 (S.D. W.Va.). The transcript, ECF No. 94, Trans. Revocation Hrg., *United States v. Moore*, No. 2:19-cr-303 (S.D. W. Va. Aug. 26, 2021), has been attached as an exhibit to the underlying motion. (Document 31-1) [hereinafter "Rev. Tr."].   Despite the audio of the comments in the bodycam footage, at the hearing, Officer McCabe testified that he "asked [the Defendant] if he would come and speak to [the Officer]." (Rev. Tr. at 28).

Officer McCabe informed Mr. Moore of his suspicions, stating that "every time I drive by you keep looking at me and walking away.   I saw you make a couple hand to hand transactions." (*Id.* at 00:11-00:17.)   Mr. Moore denied the insinuation, raising his arms and stating, "[n]o I don't sell no drugs."   (*Id.* at 00:18.)   He persisted in denying having any drugs on his person when Officer McCabe continued to inquire.   Officer McCabe then began reaching his right hand behind his back for his leather gloves, and Mr. Moore began to take off his bag.[3]   (*Id.* at 00:23.)   Officer McCabe proceeded to put on his gloves and stated, "I'm gonna pat you down real quick to make sure you ain't got any guns or weapons. I'm just telling you why I'm stopping you, okay?"   (*Id.* at 00:24-00:27.)

As Officer McCabe completed that statement, Mr. Moore raised his hands over his head and began walking toward the brick wall behind him.   (*Id.* at 00:26-00:27.)   Officer McCabe walked toward Mr. Moore and began patting him down while saying, "[j]ust saying, as of right now you ain't in any trouble, just want to make sure you ain't got anything on you, 'cause you know what hand-to-hands means sometimes."   (*Id.* at 00:28-00:33.)   Mr. Moore interjected, "I don't even have no weed."   (*Id.* at 00:34.)   While he continued patting Mr. Moore down, Officer McCabe asked, "why you dapping people up out here?"   (*Id.* at 00:34-00:35.)   Officer McCabe then took his hands off Mr. Moore who began to turn around with his back to the brick wall and asked the officer for clarification.   (*Id.* at 00:35.)   Officer McCabe continued inquiring about Mr. Moore's conduct stating, "I saw you walking to cars, and I saw you dab a dude up in his car, and then when I walked by, drove by, you acted real nervous every time I drove by."   (*Id.* at 00:35-

---

[3] At the revocation hearing, Officer McCabe testified that the Defendant "immediately took the backpack off and distanced himself from that article."   (Rev. Tr. at 12).   However, the video shows the Defendant did not begin removing the bag until approximately 20 seconds into the encounter and only distanced himself from the bag by moving toward the wall for the pat down.   (McCabe Bodycam Footage at 00:23-00:25.)

00:43.)   Officer McCabe mimicked a "dapping" hand-to-hand motion while explaining his suspicion to Mr. Moore.[4]   (*Id.* at 00:36-00:40.)

As Officer McCabe finished his explanation, Mr. Moore raised his hands above his head, with his back to the wall, and stated "listen, I'm on Federal pap…I don't, I don't."   (*Id.* at 00:43-00:46.)   While Mr. Moore was completing his statement with his back still against the brick wall, and with Officer Napier standing on his left side, Officer McCabe, standing on his right side, reached down, and picked up the backpack that Mr. Moore had removed before the pat down and asked, "can I look in here?"   (*Id.* at 00:46-00:47.)   Mr. Moore shrugged and replied, "go ahead." (*Id.* at 00:48.)

As Officer McCabe began walking with the bag toward his vehicle, he asked Mr. Moore, "[y]ou're on Federal papers for what?" to which Mr. Moore replied, "Federal papers."   (*Id.* at 00:50-00:53.)   Officer McCabe then asked Mr. Moore for his name and whether he lives in the area, to which Mr. Moore supplied answers.   (*Id.* at 00:53-00:59.)   As Mr. Moore stayed with Officer Napier, Officer McCabe began searching through the backpack, at which point he found a loaded Hi-Point model C9 .9mm caliber pistol.   (*Id.* at 01:00-01:10.)   Officer Napier then placed Mr. Moore in handcuffs at Officer McCabe's instruction.   (*Id.* at 01:11-01:12.)   After Mr. Moore inquired why he was being handcuffed, Officer McCabe explained, "because you've got a handgun in your bag, you just told me you're on Federal papers."   (*Id.* at 01:33-01:35.)   At that point, Mr. Moore claimed that the bag did not belong to him and claimed he was holding the bag for someone else.   (*Id.* at 01:36-01:39.)   Officer McCabe also found multiple cell phones and a bag of

---

4 Despite this depiction of the officer's comments and movements in the bodycam footage, at the revocation hearing, Officer McCabe denied knowing what either "dabbing" or "dapping" is.   (Rev. Tr. at 28.)

suspected K2 in the backpack.   Mr. Moore was arrested for being a felon in possession of a firearm.

On July 12, 2021, Mr. Moore's probation officer filed a Petition for a Warrant or Summons for Offender Under Supervision, alleging that Mr. Moore violated certain terms of his supervision. At the hearing, Officer McCabe testified to many of the circumstances surrounding his interaction with Mr. Moore relevant to this motion.   He noted that he was conducting his normal beat when he witnessed the Defendant, whom he had not previously seen.   He testified that the Par Mar was in an area with high drug traffic, and that he observed the Defendant stand in the parking lot and interact with an individual in a way that could possibly have been a hand-to-hand transaction.   He further testified that he did not see the Defendant give anything to someone else, receive anything in return, or hold an object in either hand.   Officer McCabe testified that at the time he initiated the encounter with Mr. Moore, he did not have reasonable suspicion to support stopping or detaining Mr. Moore.   He indicated that the entire encounter was consensual.   He testified that Mr. Moore consented to speak with him, consented to the pat down, and consented to the search of the backpack.   After the hearing, this Court found that Mr. Moore had violated the terms of his supervised release by a preponderance of the evidence and sentenced him to the custody of the Federal Bureau of Prisons for a period of 18 months.

## STANDARD OF REVIEW

When deciding a motion to suppress, the district court may make findings of fact and conclusions of law.   *United States v. Stevenson,* 396 F.3d 538, 541 (4th Cir. 2005).   On a motion to suppress, the burden of proof is on the party who seeks to suppress the evidence.   *United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981).   However, once the defendant establishes a

proper basis for his motion to suppress, the burden shifts to the government to prove the admissibility of the challenged evidence by a preponderance of the evidence.   *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

## DISCUSSION

The Defendant moves to suppress all evidence discovered from the encounter and all non-*Mirandized* statements he made.   He asserts that the interaction amounted to an unlawful investigatory stop of his person absent reasonable suspicion in violation of the Fourth Amendment to the United States Constitution.   He further asserts that any potentially incriminating statements made during the encounter amount to non-*Mirandized* custodial statements obtained in violation of the Fifth and Sixth Amendments to the United States Constitution.

The United States counters that the interaction was a consensual police-citizen encounter and therefore does not implicate the Fourth Amendment.   It contends that the initial interaction, the pat down of Mr. Moore, and the subsequent search of the backpack all occurred with the voluntary consent of the Defendant.   The United States also asserts that because the Defendant's statements were not the product of custodial interrogation, they should not be suppressed. Further, it argues that even if the pat down was improper, the incriminating evidence was only found through the search of the backpack, to which the defendant verbally consented. Alternatively, the United States argues that the Defendant had abandoned the backpack before the search such that he waived any legitimate expectation of privacy in the backpack, resulting in the Fourth Amendment not being implicated.

6

As detailed herein, the evidence should be suppressed.   Even if the initial interaction with the Defendant began as a consensual police-citizen encounter,[5] it would nonetheless have transformed into an unlawful investigatory stop when Officer McCabe initiated a pat down of the Defendant absent reasonable suspicion and without consent.   Thus, while the Defendant nominally gave verbal consent to the search of the backpack, given that it occurred during a brief, continuous encounter, the taint of the illegality of the pat down had not dissipated and the consent was therefore invalid.   As a result, the evidence uncovered because of that consent and search must be suppressed.   Further, given the impart of the suppression of the firearm on the underlying charge, the suppression of any non-*Mirandized* statements is not essential to the disposition of the case.

A.   *Fourth Amendment Seizure*

The Fourth Amendment to the United States Constitution protects people against unreasonable searches or seizures.   U.S. Const. amend.   IV.   This protection against unreasonable seizures extends to "brief investigatory stops," or *Terry* stops.  *United States v. Kehoe*, 893 F.3d 232, 237 (2018) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)).   However, the Fourth Amendment is not implicated "simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick,* 501 U.S. 429, 434 (1991).   Officers may interact with individuals and request consent to search their possessions without triggering Fourth Amendment considerations, if "a reasonable person would feel free to decline the officers' requests or otherwise

---

5 As the Court details below, the Court is unconvinced that the initial interaction between Officer McCabe and the Defendant was truly a consensual police-citizen encounter.   However, even if it was consensual, the unlawful detention occurred at the initiation of the pat down, if not before.   In either scenario, the unlawful seizure occurred prior to the purported consent to search the bag.   Therefore, the determination of whether the initial encounter began as consensual has no bearing on the determination that suppression is warranted.

terminate the encounter." *Id.* at 437. "Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means." *United States v. Drayton*, 536 U.S. 194, 201 (2002). These non-seizure encounters are referred to as consensual "police-citizen encounter[s]." *United States v. Jones*, 678 F.3d 293, 299 (4th Cir. 2012).

This ability to engage in consensual police-citizen encounters is a critical tool for effective law enforcement. As the Fourth Circuit has explained, "[i]t is axiomatic that police may approach an individual on a public street and ask questions without implicating the Fourth Amendment's protections. Without such an ability, law enforcement officials would be neutralized to the point of being ineffective." *United States v. Weaver*, 282 F.3d 302, 309 (4th Cir. 2002). Merely seeking cooperation or information does not raise the level of interaction to a seizure. *United States v. Black*, 525 F.3d 359, 364 (4th Cir. 2008). Despite this freedom, however, law enforcement must be cautious not to overstep this tool in a manner that converts an otherwise consensual encounter into an encounter implicating an individual's Fourth Amendment protections.

A consensual police-citizen encounter is converted into a seizure when "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Courts examine several factors in applying a totality of the circumstances test to determine whether a consensual police-citizen encounter has converted to a seizure, including:

> "the time, place and purpose of the encounter, the words used by the
> officer, the officer's tone of voice and general demeanor, the officer's

8

> statements to others present during the encounter, the threatening presence of several officers, the potential display of a weapon by an officer, and the physical touching by the police of the citizen."

*Weaver*, 282 F.3d at 310 (citations omitted).   Additionally, Courts may consider whether officers were uniformed, whether they attempted to block the Defendant or restrain his movement, or "whether they treated the defendant as though they suspected him of illegal activity rather than treating the encounter as routine in nature." *Jones*, 678 F.3d at 299.   No single factor is dispositive.[6]   *Weaver*, 282 F.3d at 310.   Instead, the court looks holistically to understand whether the police conduct would "have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988).   If, after consideration of these factors and the surrounding circumstances, the examining court concludes that an objectively reasonable person would not have believed he was free to leave, a seizure has occurred.

Without consent, a police officer is only justified in elevating an otherwise consensual encounter into this type of seizure with "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citing *Terry*, 392 U.S. at 30).   This entails the officer's ability to articulate something more than an "inchoate and unparticularized suspicion or 'hunch.'" *Id.* (citing *Terry*, 392 U.S. at 27).   The officer must have a suspicion that constitutes a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Griffin*, 589 F.3d 148, 152 (4th Cir. 2009) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981).   "Anything less would invite

---

6 Despite this, the Fourth Circuit has noted that, in the context of searches, "[w]hether the individual search was informed of his right to decline the search is a 'highly relevant; factor," although not in and of itself dispositive. *United States v. Jaamal Antonio Robertson*, 736 F.3d 677, 680 (4th Cir. 2013) (citing *United States v. Wilson*, 895 F.2d 168, 172 (4th Cir. 1990).

intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches." *Terry*, 392 U.S. at 22.

Once an officer has a basis for a lawful investigatory stop, the officer may engage in a protective search for weapons if he "has reason to believe that the suspect is armed and dangerous." *Adams v. Williams*, 407 U.S. 143, 146 (1972). However, an officer may not conduct a protective search absent the reasonable suspicion required to justify the initial stop. *United States v. Burton*, 228 F.3d 524, 527 (4th Cir. 2000) (citing *Terry*, 392 U.S. at 32-33). In other words, officers may not touch a citizen "in search of anything" without "constitutionally adequate, reasonable grounds for doing so." *Sibron v. New York*, 392 U.S. 40, 64 (1968). To determine whether this reasonable suspicion existed, courts examine the totality of the circumstances. *United States v. Foster*, 824 F.3d 84, 89 (4th Cir. 2016).

Here, the officer lacked reasonable articulable suspicion when he instructed the Defendant to come to him, and then engaged in a pat down search of the Defendant's person. The Fourth Circuit has made clear that the type of behavior the officers reportedly observed in this case does not rise to the level of particularized, articulable facts to create the requisite reasonable suspicion to support an investigatory stop. *See United States v. Drakeford*, 992 F.3d 255, 263-65 (4th Cir. 2021). In *Drakeford*, the court rejected the contention that witnessing "a quick dap, quick handshake" followed by a brief conversation and second handshake the officer "believed to be a hand-to-hand transaction" was sufficient to constitute reasonable suspicion. *Id.* The court specifically highlighted the fact that the officers did not witness any drugs or money change hands, or any contraband in the Defendant's hands. *Id.* at 264. Absent any additional facts, the court concluded that these observations could not support a reasonable conclusion that such a "benign

and common gesture" can be viewed as an exchange of drugs.  *Id.*  Moreover, the officers in *Drakeford* had additional information, through a confidential informant, beyond what was available to the officers in this case, and the court still rejected the claim of reasonable suspicion. *Id.*

    In this case, aside from the purported handshakes, the officers could only point to the fact that this area generally was believed to be a high drug trafficking area and the observation that Mr. Moore walked away every time he saw the police officers circle around. (McCabe Bodycam Footage at 00:11-00:15); (Rev. Tr. at 21).   The officers did not witness any money, drugs, or other contraband exchange hands, and they had no prior knowledge of the Defendant.   (Rev. Tr. at 24-25).   These facts, given the totality of the circumstances, simply do not rise to the particularized level of suspicion required to initiate an investigatory stop.   This conclusion is shared by the officer who initiated the interaction.   Officer McCabe testified that he did not believe he had reasonable suspicion to support an investigatory stop and thus relied on what he testified was consent to carry out the interaction.   (Rev. Tr. at 26).   Finally, even if he had reasonable suspicion for an initial stop, no articulated facts support the belief that the Defendant may have been armed or dangerous to justify a protective frisk of the Defendant.   After the Defendant approached, at the request of the officer, the only intervening action that occurred was the Defendant raising his arms and denying any accusation that he possessed drugs.   (McCabe Bodycam Footage at 00:09-00:23.)   If anything, this conduct would dissuade concerns about the defendant being armed and dangerous.   Thus, no reasonable suspicion supported an initial investigatory stop, or a subsequent protective frisk of the Defendant.

Absent reasonable suspicion, the only permissible pathway to the encounter is if it was consensual. The Court finds that it was not. Even if one assumes the initial encounter was consensual, the initiation of the pat down and surrounding circumstances removed any remaining doubt as to the non-consensual nature of the interaction.

At the outset, Officer McCabe stood at the side of the parking lot, reached his arm out in the Defendant's direction, and made a motion beckoning the Defendant while saying "[h]ey buddy, come here for a sec," requiring Mr. Moore to walk over toward him and his uniformed partner. (*Id.* at 00:04.) This interaction is far closer to a command than an invitation to a consensual conversation. The "come here" directive required the Defendant to walk across a parking lot and join two armed, uniformed officers on a sidewalk. This approach was quickly followed by a calm assurance that the Defendant was not in any trouble and that the officer simply wanted to talk to him. (*Id.* at 00:09.) However, the officer proceeded to detail why he was suspicious of the Defendant and insinuated that he may be engaged in drug dealing. (*Id.* at 00:11-00:17.) It is not clear that given the directive to approach, the presence of two armed uniformed officers, the insinuation that the Defendant was engaged in drug activity, and the fact that the Defendant was not informed he was free to decline the encounter, that a reasonable person would have felt free to leave the interaction. Despite the calm, conversational tone of the officer, he seemingly required the Defendant's acquiescence to his show of authority to walk across the parking lot, and quickly accused the Defendant of suspicious behavior. The Court, however, need not determine whether the directive to approach two armed, uniformed officers, followed by questioning about involvement in criminal activity, is compatible with a consensual encounter because no potentially incriminating information or evidence was uncovered prior to the pat down. Still, the progression

Case 2:21-cr-00188   Document 51   Filed 02/03/22   Page 13 of 20 PageID #: 302

of events factors into the determination of whether an individual would feel free to leave at a later point.

If it had not already occurred, an unlawful Fourth Amendment seizure occurred when the officers initiated a pat down of the Defendant absent reasonable suspicion or consent.  While the United States argues that Mr. Moore initiated taking his bag off before the officer "asked" to pat him down, the video shows something different.  The officer's hands began moving toward his back pocket to retrieve his gloves, prompting the Defendant to take his bag off.  (*Id.* at 00:23.) Then, as the Defendant moved toward the wall, the officer began putting his gloves on and said, "*I'm gonna pat you down* real quick to make sure you ain't got any guns or weapons. I'm just telling you why I'm *stopping* you, OK?"  (*Id.* at 00:24-00:27) (emphasis added).  This was not a request, but rather an explanation of what the officer was going to do.  Further, he stated that he was "stopping" the Defendant.[7]  While the Defendant did voluntarily move toward the wall without officer force, and he did not verbally object to the pat down, the officer's language and actions indicate that he intended to carry out the pat down.  With a uniformed officer on either side of the Defendant, Officer McCabe placed his hands on the Defendant, and clearly indicated his suspicion that the Defendant was engaged in criminal activity.  (*Id.* at 00:28-00:33.)  Thus, based on the totality of the surrounding circumstances, considering the factors the Fourth Circuit has articulated, no reasonable person in the Defendant's position would have felt free to leave.

To support its argument that the Defendant's non-verbal conduct sufficiently constitutes consent, the United States directs the Court to the Fourth Circuit's decision in *United States v.*

---

7 The United States downplays this language, arguing that any consensual interaction technically stops a person, but examining the language used is one important factor in determining whether a reasonable person would objectively think the interaction was voluntary.  An officer informing an individual that they are stopped could certainly impact whether the individual would think he was free to leave the interaction.

13

*Wilson,* 895 F.2d 168 (4th Cir. 1990).   The facts in this case, however, are readily distinguishable. In *Wilson*, the court held that it was not clearly erroneous for a district court to find that an individual consented to a pat down when he "shrugged" and "raised his arms in response to [the agent's] request for permission to pat him down, a request made without threats, force, or physical intimidation." *Wilson*, 895 F.2d at 170.   Critically, however, before taking any action to pat down the suspect in *Wilson*, the officer *asked* if he could pat him down, after he had previously *asked* if he could speak with him.   *Id.*   Here, Officer McCabe did not make any request.   Instead, he informed the Defendant that he was going to pat him down to check for weapons.   While no one factor is dispositive, given the lack of any verbal consent, the lack of a request or any indication that the pat down could be declined is highly significant in considering whether Mr. Moore's physical acquiescence to the pat down constituted consent, particularly given that physical resistance could escalate the situation or result in a separate criminal charge.

The United States additionally highlights *United States v. Mendenhall*, 446 U.S. 544 (1980), to support the argument that Mr. Moore consented to the pat down. The case is similarly distinguishable.   In *Mendenhall*, the officers *asked* the Defendant to accompany them to a private room and *asked* to conduct a search.   446 U.S. at 557-58.   Additionally, the agents were not uniformed, were not displaying any weapons, and the officers "did not summon the respondent to their presence, but instead approached her and identified themselves as federal agents."   *Id.* at 555.   Here, there was no request to conduct the pat down, the officers were uniformed and carrying weapons, with their police vehicle parked nearby.   Further, unlike in *Mendenhall*, Officer McCabe *did* summon the Defendant rather than approach him.   Examining the totality of the

circumstances, many of the factors which supported a finding of consent in *Mendenhall* are not present here.

Therefore, because no reasonable suspicion supported the pat down, and the totality of the circumstances indicates that a reasonable person would not have felt free to leave, the pat down constituted an illegal seizure of the Defendant in violation of his rights under the Fourth Amendment.  If the incriminating evidence had been found during the unlawful pat down, it would necessarily be suppressed.   The incriminating firearm, however, was found in a subsequent search of the Defendant's backpack, so the inquiry must continue.

B.   *Search of Backpack*

Given the Court's finding that the investigatory stop and pat down was unlawful, the inquiry then turns to whether Mr. Moore could, and whether he did, consent to the search of his backpack.   The Court finds that irrespective of whether he verbally consented to the search, the taint from the illegality of the pat down had not dissipated such that his consent was an independent act of free will.   Therefore, there was no lawful consent to search the backpack and any evidence obtained from the search must be suppressed.

"Evidence gathered as fruit of an unreasonable search or seizure is generally inadmissible against a defendant." *United States v. Brown*, 401 F.3d 588 (4th Cir. 2005).   The Fourth Circuit has synthesized several factors to consider when examining the attenuation between the taint of an illegal search and subsequent consent: "(1) the time between the Fourth Amendment violation and the consent, (2) the presence of intervening circumstances, and (3) the flagrancy of the official misconduct." *United States v. Hill*, 649 F.3d 258, 267-68 (4th Cir. 2011) (citing *Brown v. Illinois*¸ 422 U.S. 590, 603-04 (1975)).   In evaluating whether the taint of the illegality has vitiated, "courts

conduct a case-by-case analysis of the facts." *United States v. Ceccolini*, 435 U.S. 268, 276 (1978). Ultimately, the government bears the burden of proving that the taint of the unlawful stop had dissipated prior to the purportedly valid consent. *United States v. Seidman*, 156 F.3d 542, 548 (4th Cir. 1998).

Applying the *Hill* factors to this case, the key facts dictate a finding that the taint had not dissipated prior to Mr. Moore's ostensible consent. While the third factor may point in favor of the United States' position, as the intrusion of the unlawful pat down was both brief and limited, the first two factors weigh strongly in favor of suppression. First, only ten seconds elapsed between the illegal pat down of Mr. Moore and his verbal consent to search the backpack. This brief period of time is far shorter than that in which the Fourth Circuit has found sufficient attenuation of the effect of the illegality. *See e.g., Seidman*, 156 F.3d at 548 (taint dissipated when Defendant warmly greeted the informant and carried on a conversation with him for 45 minutes following informant's illegal entry into the home). Additionally, during that brief period, Mr. Moore had his back to a brick wall, his hands raised in the air, uniformed officers on each side of him, and an officer continuing to question him about potential criminal conduct. Thus, the investigation and the seizure continued, and no intervening circumstances broke the causal chain of events stemming from the constitutional violation. In view of all the circumstances, the factors point against finding sufficient attenuation of the illegality prior to the consent.

The Fourth Circuit has addressed a similar scenario and its reasoning is instructive in further analyzing whether sufficient attenuation of the taint of illegality existed. In *United States v. Gooding*, the Fourth Circuit suppressed evidence obtained through a consent search of a bag, when the consent was given immediately following an unlawful *Terry* stop. 695 F.2d 78, 84 (4th

Cir. 1982).   There, plainclothes officers approached an individual at an airport and asked to speak with him.   *Id.* at 79.   After he denied possessing narcotics, they requested consent to search his bag, which he granted.   *Id.* at 80.   In searching his bag, they located incriminating evidence. This entire encounter lasted approximately one minute. *Id.*   While the District Court held that the interaction amounted to a *Terry* stop, it held that Gooding had validly consented to the search.   *Id.* at 81.   The Fourth Circuit reversed.   *Id.* at 82-84. It upheld the determination that the interaction constituted a *Terry* stop, but due to a lack of reasonable suspicion, it held the stop was unlawful. *Id.*   Turning to the issue of consent, it held:

> "[A]s a matter of law on the undisputed facts of record, Gooding's illegal seizure tainted all that ensued in the investigative encounter, and that his consent to the initial search, even if voluntary, did not vitiate the taint. The connection, in temporal and causal terms, between the illegal seizure and the consent—all occurring within the same brief, continuous encounter—was not sufficiently attenuated to remove the former's taint from the ultimate fruits of the search."

*Id.* at 84 (citations omitted).   Here, a similar circumstance is presented.   Even if one assumes that the interaction between the Defendant and the officers was initially a consensual encounter, it was converted into an illegal investigative stop once the officer conducted the pat down, absent reasonable suspicion or consent.   Then, within the same, brief, continuous encounter, the officers obtained consent to search a bag which led to the incriminating evidence.   Given the balance of the *Hill* factors, and the guidance of *Gooding*, the taint of the illegality is not sufficiently attenuated from the consent and search of the backpack to avoid suppression.

The United States' alternative arguments to justify the search of the backpack are not factually or legally persuasive.   First and importantly, the only cases relied upon to support the voluntariness of Mr. Moore's purported consent to search the backpack involve situations where

no unlawful seizure had occurred.[8]   Therefore, the taint of an unlawful seizure was not a relevant consideration, and the analysis is distinct.   Additionally, the argument that the Defendant had abandoned the bag such that he no longer had an expectation of privacy in its contents is thoroughly unconvincing.   The only evidence the United States presents, in support of abandonment, is the Defendant placing his bag on the ground and then moving toward the wall for a pat down.   While the United States points to the Defendant's statements disavowing ownership, these statements occurred *after* officers observed the bag on the Defendant's shoulders, *after* they observed him sit it on the ground, and *after* the bag had been searched.   Those statements are therefore entirely irrelevant in determining whether he had disavowed ownership or abandoned the bag *prior* to the search.   *See United States v. Small*, 944 F.3d 490, 502 (4th Cir. 2019).   What officers later learned is inconsequential because a Fourth Amendment search "is good or bad when it starts." *United States v. Di Re*, 332 U.S. 581, 595 (1948).   The cited cases all involve clear disavowals of ownership occurring *prior* to the commencement of any search, or full flight from the scene leaving an item behind.[9] The United States has not identified any case, upholding abandonment, in a situation akin to that presented here, where a Defendant merely removes a bag from his person and moves a few feet away for a pat down.[10]

---

[8] *See United States v. Drayton*, 536 U.S. 194, 196 (2002) (no seizure prior to granting consent); *United States v. Lattimore*, 87 F.3d 647 (lawful seizure, signed written consent form and *Miranda* warnings given prior to granting consent);   *United States v. Price*, 599 F.2d 494 (2nd Cir. 1979) (lawful seizure and clear disclaimer of ownership by Defendant prior to granting consent); *United States v. Ramos-Burciaga*, 839 F. App'x 229 (10th Cir. 2020) (no seizure prior to granting consent);   *United States v. Cooper*, No. Civ. 1:11MJ877, 2012 WL 1831199, at *2 (E.D. Va. May 18, 2012) (no seizure prior to granting consent).

[9] *See United States v. Ferebee*, 957 F.3d 406, 414 (4th Cir. 2020) (disavowed ownership of backpack prior to police search); *Small*, 944 F.3d at 501-02 (finding disavowed ownership of phone tossed to the side of the road while fleeing suspect attempted to evade capture); *United States v. Leshuk*, 65 F.3d 1105, 1111 (4th Cir. 1995) (disavowed ownership of bags in garbage prior to police seizure and search); *United States v. Zapata*, 18 F.3d 971, 974 (1st Cir. 1994) (defendant denied knowledge of who owned bags found in his trunk prior to police search); *United States v. Hooper*, 482 F. Supp. 3d 498, 510 (E.D. Va. 2020) (finding disavowed ownership of phone and knife left on a public table when defendant fled the scene after noticing law enforcement nearby).

[10] Seemingly to support the consideration of the Defendant's comments disavowing ownership of the backpack after

Accordingly, because the pat down occurred absent reasonable suspicion and consent, and the purported consent to search the backpack occurred almost immediately thereafter as part of a brief, continuous encounter, without any intervening circumstances, the Court finds that the United States has not met its burden to prove the taint of the pat down's illegality had dissipated such that the Defendant could independently and lawfully consent.   Therefore, the search of the backpack was tainted by the preceding illegality and any evidence obtained as a result must be suppressed.

### C.   Non-Mirandized Statements

The only potentially inculpatory non-*Mirandized* statement is the Defendant's statement that he was "on Federal papers," which is not inculpatory absent the gun found during the unlawful search.   To the extent any non-*Mirandized* statements remain at issue, any such statements happened between the unlawful pat down and the purported consensual search of his backpack. Therefore, given the Court's previous findings, the Court need not inquire whether the statements were, in fact, made in violation of *Miranda*'s dictates.   The same analysis necessitating suppression of the evidence from the backpack would similarly apply.   As the taint had not dissipated, the United States cannot utilize the fruits of that illegality.

### CONCLUSION

Wherefore, after thorough review and careful consideration, the Court **ORDERS** that the *Defendant's Motion to Suppress Evidence* (Document 31) be **GRANTED**, and that the evidence detailed in the *Motion* be suppressed**.**

---

Officer McCabe had already found a firearm, the United States cites a rule emerging from *Ferebee* that an officer need not know of the disavowal prior to commencement of the search.   (Document 47 at 13).   This rule relates to an officer's knowledge of actions illustrating intent to abandon that occurred *prior* to the search.   It simply does not follow that an officer could rely on a *yet to occur* disavowal in order to retroactively justify an unlawful search.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, to the United States Attorney, to the United States Probation Office, and to the Office of the United States Marshal.

ENTER:    February 3, 2022

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA

20